IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

GUMBERG ASSOCIATES - CHAPEL )
SQUARE, WATERWORKS PHASE II, )
WGW ASSOCIATES, NORTHTOWNE )
ASSOCIATES, AND CANH ASSOCIATES, )
                                                )
            Plaintiffs, )
                                                  )
    vs. )
                                                  )
KEYBANK NATIONAL ASSOCIATION, )
AND MIDLAND LOAN SERVICES, )
                                                  )
            Defendants. )

2:20-CV-01661-CCW

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER REGARDING
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

    **I.**    **Introduction**

        Pending before this Court is Plaintiff's Motion for Preliminary Injunction.  ECF No. 39.

After considering that Motion, and a full hearing recorded by a court reporter in which counsel for

all parties participated, the Motion at ECF No. 39 is DENIED.

    **II.**    **Findings of Fact**

        **A.  Introduction and Brief Background**

        1.    Plaintiffs are the owners and operators of three large-scale shopping centers:

Waterworks Mall in Pittsburgh, Pennsylvania;  North Huntingdon Square in North Huntingdon,

Pennsylvania;  and Northtowne Mall in Defiance, Ohio (together, the "Shopping Centers").  Joint

Stips., ECF. No. 45, at ¶ 1.

        2.    In 2014, Plaintiffs entered into a commercial mortgage-backed securities loan (the

"Loan Agreement") with JPMorgan Chase Bank, National Association and Colfin Coram Penn

Retail Funding, LLC, (the "Lenders") to fund the Shopping Centers.[1]  Mot. for Prelim. Inj., ECF No. 24, at 4;  Joint Stips., ECF No. 45, at ¶ 8;  *see* Loan Agree., Joint Ex. A for Preliminary Injunction Hearing.

3.      The Loan Agreement contained a choice of law provision that applies New York substantive law to disputes that arise from the Loan Agreement.  *See* Loan Agree., Joint Ex. A, at § 10.3;  Joint Stips., ECF No. 45, at ¶ 27.

4.      Plaintiffs, as Borrowers;  JPMorgan Chase Bank, National Association, as a Note A-1 Lender;  Wells Fargo Bank, N.A., as Account Agent;  and J.J. Gumberg Co., as Manager, also entered into a Cash Management Agreement on April 1, 2014 in connection with the Loan Agreement.  Cash Mgmt. Agree., Joint Ex. B for Preliminary Injunction Hearing.

5.      Defendant Keybank National Association is the master servicer and Defendant Midland Loan Services is the special servicer of the loan underlying the Loan Agreement (together, the "Servicers").  Reply Br. in Supp. of Mot. for Prelim. Inj., ECF No. 24, at 4–5;  Joint Stips., ECF No. 45, at ¶ 10.

6.      The Servicers are not parties to the Loan Agreement or the Cash Management Agreement.  *See* Loan Agree., Joint Ex. A;  Cash Mgmt. Agree., Joint Ex. B.

7.      The Servicers are responsible for enforcing the Loan Agreement as agents of the Lenders.  *See* Reply Br. in Supp. of Mot. for Prelim. Inj., ECF No. 24, at 5.

8.      The Loan Agreement provides for a series of occurrences that trigger a "Cash Sweep Period" whereby the Lenders retain the "Excess Cash Flow" as additional security for the

---

[1] Neither party has refuted or presented evidence to dispute that the Loan Agreement is the result of a bargained-for exchange that was negotiated by the Plaintiffs who were represented by counsel and were not under duress or fraud when they entered into the Loan Agreement.

Loan, rather than disbursing it to the Plaintiffs, until the Loan is paid off. *See generally* Loan Agree., Joint Ex. A, § 7.5.1.

9.     Believing that JC Penney triggered the Cash Sweep Period when it closed its location at one of the Shopping Centers, and acting to enforce the Loan Agreement as they understand it, Servicers intend to carry out a Cash Sweep by sweeping the Excess Cash Flow into the Rollover Reserve Account beginning December 1, 2020.

10.    Plaintiffs allege that by threatening the Cash Sweep, which they contend is an unenforceable liquidated damages penalty under the applicable New York law and violative of the New York Uniform Commercial Code, Servicers tortiously interfered with Plaintiffs' business relationships and violated the implied covenant of good faith that comes with the Loan Agreement. Plaintiffs seek a preliminary injunction to enjoin the Servicers from implementing any Cash Sweep in connection with JC Penney's lease or tenancy. *See generally* Mot. for Prelim. Inj., ECF No. 39.

### B. Procedural History

11.    Plaintiffs began this lawsuit on October 23, 2020 by filing the Complaint in the Allegheny County Court of Common Pleas, GD-20-011077. Compl., ECF No. 38.

12.    Plaintiffs allege that the Servicers violated the Loan Agreement's implied covenant of good faith and fair dealing by failing to approve certain leases and lease extensions in good faith and with reasonable promptness, and by threatening to conduct a Cash Sweep because JC Penney closed its location at the Shopping Centers. Compl., ECF No. 38, Count I.

13.    The Plaintiffs also accuse the Servicers of tortiously interfering with the Plaintiffs' business relations with their tenants, and prospective tenants. Compl., ECF No. 38, Count II.

14.     On October 26, 2020, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction with the Allegheny County Court of Common Pleas, seeking the following order:

> During the pendency of this case, or until further order of this Court, Defendants shall be enjoined from implementing any "cash sweep" action under the Loan Agreement pertaining to or related to, or considered to be triggered by, JC Penney or JC Penney's lease and/or tenancy as they pertain to that Loan Agreement.

Pls.' Mot. for Prelim. Inj., ECF No. 39, at 14.

15.     On October 30, 2020, Servicers removed the action to this Court.  Notice of Removal, ECF No. 1.

16.     On November 3, 2020, the case was transferred from the Honorable Joy Flowers Conti to the undersigned.

17.     On November 10, 2020, Servicers responded to Plaintiffs' motion for injunctive relief.  ECF No. 15.

18.     On November 11, 2020, Plaintiffs moved for leave to reply to the Servicers' response.  ECF No. 16.

19.     On November 12, 2020, the Court denied the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction to the extent it sought a temporary restraining order but granted Plaintiffs' motion to file a reply in support of their request for a preliminary injunction. ECF No. 19.

20.     On November 13, 2020, Plaintiffs filed a reply brief and other documents in support of their Motion for Preliminary Injunction.  ECF Nos. 23–24.

21.    The Court held a Telephonic Preliminary Injunction Status Conference on November 19, 2020 to address the issues raised by the Plaintiffs' motion for injunctive relief.  *See* ECF No. 35.

22.    The Court ordered the parties to meet and confer prior to the November 19, 2020 conference regarding any proposed consent orders that could be entered related to Plaintiffs' Motion for Preliminary Injunction, but the parties did not reach any agreements prior to the conference.  *See* ECF No. 36.

23.    During the November 19, 2020 conference, counsel agreed to consult with their clients regarding whether the parties could agree to delay the December 1, 2020 Cash Sweep for several weeks to provide the parties and the Court with time to conduct a hearing and reach a decision.  The Court further advised the parties that if agreement could not be reached, the Court would hold an evidentiary hearing on the preliminary injunction on November 30, 2020.  Both sides advised the Court that they did not seek discovery relating to the request for a preliminary injunction.  *See* ECF No. 36.

24.    After close of business on Friday, November 20, 2020, the parties advised the Court that they had not been able to reach agreement to postpone the December 1, 2020 Cash Sweep.

25.    Accordingly, the Court held a hearing on the Plaintiffs' Motion for Preliminary Injunction via Zoom videoconferencing service on November 30, 2020.[2]  *See* Minute Entry for the November 30, 2020 Hearing, ECF No. 47.

---

[2] In light of Plaintiffs' concern that they would be irreparably harmed if Servicers perform under the Cash Sweep Period effective December 1, 2020, the Court held the preliminary injunction hearing, and is issuing this decision before the December 1, 2020 cash sweep occurs.  In light of the time constraints, a hearing transcript was not available and the Court has therefore prepared these Findings of Fact and Conclusions of Law, and Order regarding Plaintiffs' Motion for Preliminary Injunction without the benefit of a transcript from today's November 30, 2020 hearing.

### C.  Preliminary Injunction Hearing Testimony

26.    Plaintiffs called the following witnesses at the November 30, 2020 evidentiary hearing:

> a)  Alfred R. Reitano, President and Chief Operating Officer of J.J. Gumberg Co.;
>
> b)  Stephen P. Petrosky, Senior Vice President and Director of Finance of J.J. Gumberg Co.;  and
>
> c)  Ira. J. Gumberg, Chair and Chief Executive Officer of J.J. Gumberg Co.

The Court found the Plaintiffs' witnesses to be credible.

27.    Plaintiffs' witness Mr. Reitano testified that the Plaintiffs use the Excess Cash Flow to pay any unexpected shortfalls that are not covered by the budgeted expenses and that the Cash Sweep Period will make things "very difficult" such that the Plaintiffs "probably won't" be able to maintain the Shopping Centers as they do now.  Mr. Reitano confirmed that a Cash Sweep Event occurred when JC Penney left Northtowne Mall;  that, during the Cash Sweep Period, the Lenders retain the Excess Cash Flow as security for the loan;  that the Servicers do not "pocket" the Excess Cash Flow during the Cash Sweep Period;  that the Plaintiffs already cured two Tenant Trigger Events before the JC Penney Trigger Event;  and that based on the terms of the Loan Agreement, the Plaintiffs are not entitled to cure the JC Penney Trigger Event.  Mr. Reitano also testified that, even though Plaintiffs have lined up Ollie's Bargain Outlet to replace JC Penney as a tenant in the Northtowne Mall, Ollie's Bargain Outlet does not satisfy the requirements of a JC Penney Replacement Tenant under the Loan Agreement because Ollie's Bargain Outlet is not yet occupying the premises, is not open for business, is not currently paying rent, and is not likely to be paying rent and open for business for another six months.

28.     Plaintiffs' witness Mr. Petrosky testified that, consistent with the retail industry generally, the Plaintiffs' monthly revenue and expenses fluctuate monthly and that the Plaintiffs use the Excess Cash Flow to deal with the natural rhythm of ups and downs as well as any "extraordinary items" that the Plaintiffs might have.  On cross examination, Mr. Petrosky testified that the Cash Management Agreement provides specific conditions under which the Servicers can access the funds in the Cash Management Account and that the Cash Management Agreement provides an opportunity for the Plaintiffs to apply for additional funding to cover Extraordinary Expenses, even during a Cash Sweep Period.  Mr. Petrosky also testified that the Cash Sweep Period continues until the Loan is paid in full.  He testified that the Plaintiffs would have to pay a $19–20 million prepayment fee to repay the loan in advance;  a fee that was negotiated-for when the parties entered the Loan Agreement in 2014 and which he described as not a "viable option."

29.     Plaintiffs' witness Mr. Gumberg testified that he has been on the board of several major institutions, including the University of Pittsburgh and Carnegie Mellon University.  He testified that he considers himself sophisticated and that he approved of the terms of the Loan Agreement before the Plaintiffs entered into it.  Mr. Gumberg testified that the Plaintiffs are also sophisticated entities.  He explained that the Loan Agreement is a non-recourse loan that limits the security options of the Lenders.  Mr. Gumberg testified that JC Penney vacating the Northtowne Mall did not impose a credit risk on the Plaintiffs.

30.     Plaintiffs did not offer any evidence of the following:

      a.   That Plaintiffs entered into a contract with the Servicers, as opposed to with the Lenders, who are parties to the Loan Agreement but not parties to this lawsuit;

      b.   That the Cash Sweep Period would force the Plaintiffs into bankruptcy;

c.  Any specific deals that would fall through if the Lenders retain the Excess Cash Flow as additional security;

d.  Any bills that the Plaintiffs would not be able to pay if the Lenders retain the Excess Cash Flow as additional security;

e.  That the Plaintiffs cannot obtain additional lines of credit or alternate funding for contingencies;

f.  That the Plaintiffs sought additional lines of credit or alternate funding for contingencies;

g.  That the Plaintiffs were denied additional lines of credit or alternate funding for contingencies;

h.  That the Plaintiffs have incurred or are likely to incur a specific Extraordinary Expense as defined by the Loan Agreement;

i.  That if the Plaintiffs incur or are likely to incur a specific Extraordinary Expense as defined by the Loan Agreement, and the Plaintiffs submit a request for funding to pay for the Extraordinary Expense under Loan Agreement 5.1.11(e), that the Agent will deny such a request.

31.  Defendants did not call any witnesses.

### D.  JC Penney Cash Sweep Event

32.  The Loan Agreement requires the Plaintiffs to supply additional security for the Loan in the event of certain contingencies, each of which is a "Cash Sweep Event," for the duration of the "Cash Sweep Period."  The Loan Agreement provides:

> During a Cash Sweep Period, Borrower shall deposit with Agent all Excess Cash Flow in the Cash Management Account, which shall be held by Agent as additional security for the Loan and amounts so held shall be hereinafter referred to as the "Excess Cash Flow

> Reserve Fund" and the account to which such amounts are held shall
> hereinafter be referred to as the "Excess Cash Flow Reserve
> Account."

Loan Agree., Joint Ex. A, at § 7.5.1.

33.     One of the triggers for the Cash Sweep Period is a "Tenant Trigger Event."  Loan
Agree., Joint Ex. A, at pp. 3, 4  A Tenant Trigger Event occurs when one of the seven enumerated
retail tenants at the Shopping Centers "'goes dark,' vacates or abandons its premises at the
[Shopping Centers]."  Loan Agree., Joint Ex. A, at pp. 7, 11, 12, 18, 31, 38, 40.

34.     JC Penney is one of the seven enumerated stores that would trigger a Tenant Trigger
Event if it left the Northtowne Mall.  Loan Agree., Joint Ex. A, at pp. 8–9, 18, 38.

35.     Generally, Plaintiffs can stop a Tenant Trigger Event from causing a Cash Sweep
Event by curing the Tenant Trigger Event.  Loan Agree., Joint Ex. A, at 38.

36.     To cure a JC Penney Trigger Event, Plaintiffs must  either (1) replace the JC Penney
lease according to the JC Penney Replacement Lease Criteria;  (2) renew the JC Penney lease using
the JC Penney Renewal Criteria;  or (3) satisfy the Trigger Event Cap, provided that no other
Tenant Trigger Event exists.  Loan Agree., Joint Ex. A, at 38.

37.     However, the Plaintiffs can avoid the Cash Sweep Event by curing a Tenant Trigger
Event only twice — not more.  Loan Agree., Joint Ex. A, at 38.

38.     Once the Cash Sweep Period is triggered, the Lenders retain the "Excess Cash
Flow" as additional security for the Loan.  Loan Agree., Joint Ex. A, at § 7.5.1.

39.     "Excess Cash Flow" is the money that is left in the Cash Management Account
(which is funded by tenant rent payments) after the following items are deducted:  (1) escrow funds
to ensure payment of insurance premiums for policies covering the Shopping Centers;  (2) escrow
funds to pay real estate taxes in connection with the Shopping Centers;  (3) funds to pay the debt

service fee;  (4) escrow funds for replacements needed at the Shopping Centers;  and (5) money to fund the reserve for tenant improvements and leasing commissions.  *See* Resp. in Opp. to Mot. for Prelim. Inj., ECF No. 15, at 2–3; *see also* Joint Stips., ECF No. 45, at ¶¶ 14–18;  Cash Mgmt. Agree., Joint Ex. B, at §§ 3.1, 3.2,  3.4.

40.     Even during a Cash Sweep Period, Plaintiffs have access to money for the Shopping Centers' Operating Expenses.  Money for monthly Operating Expenses that are set forth in an Approved Annual Budget is deposited into an Operating Expense Subaccount.  Thus, Excess Cash Flow is not needed to fund such Operating Expenses, even during a Cash Sweep Period.  *See* Cash Mgmt. Agree., Joint Ex. B, at § 3.4(h).

41.     Even during a Cash Sweep Period, Plaintiffs can request and receive funds for extraordinary expenses or certain other expenses, even if such expenses are not set forth in an Approved Annual Budget.  "During a Cash Sweep Period, in the event that Borrower must incur an extraordinary expense or capital expense not set forth in the Approved Annual Budget (each an 'Extraordinary Expense'), then Borrower shall promptly deliver to Agent a reasonably detailed explanation of such proposed Extraordinary Expense for Agent's approval, which may be given or denied in Agent's sole discretion."  Loan Agree., Joint Ex. A, at § 5.1.11(e);  *see also*, Cash Mgmt. Agree., Joint Ex. B, at § 3.4(i).

42.     It is undisputed that JC Penney closed its location at Plaintiffs' Northtowne Mall on October 18, 2020 after it filed for Chapter 11 bankruptcy relief.  Joint Stips., ECF No. 45, at ¶22.  It is also undisputed that JC Penney's closing was the third Tenant Trigger Event under the Loan, given that the Plaintiffs had already performed two Tenant Trigger Event Cures when Sears and Elder-Beerman left the Shopping Centers in 2016 and 2018, respectively.  *See* Compl., ECF. No. 38, at ¶ 41;  Keybank's Opp. to Mot. for Prelim. Inj., ECF No. 15, at 4, 10 n.8;  Midland Loan's

Joinder in Keybank's Opp. to Mot. for Prelim. Inj., ECF No. 17, at 1; Reply Br. in Supp. of Mot. for Prelim. Inj., ECF No. 24, at 7, 10; Joint Stips., ECF No. 45, at ¶¶ 21–25. Mr. Reitano testified at the Preliminary Injunction Hearing that, under the terms of the Loan Agreement, the Plaintiffs are not entitled cure the JC Penney Trigger Event because they already cured two Tenant Trigger Events.

43. On December 1, 2020, the Servicers plan to carry out the Cash Sweep Period by sweeping the Excess Cash Flow into the Rollover Reserve Account. Joint Stips., ECF No. 45, at ¶ 26.

44. Plaintiffs sought to replace the JC Penney Lease with a lease with Ollie's Bargain Outlet. *See* A. Reitano Aff., ECF No. 23, at ¶¶ 27–30.

45. Mr. Reitano testified that Ollie's Bargain Outlet does not meet the criteria under the Loan Agreement to replace JC Penney Replacement Tenant to predicate a Tenant Trigger Event Cure because it is not paying rent and open for business. *See* Loan Agree., Joint Ex. A, at p. 17.

46. Plaintiffs have not offered evidence of any concrete, non-speculative harm that will befall the Plaintiffs without an injunction. They did not proffer any evidence that they will certainly default under the Loan Agreement without the Excess Cash Flow; that they have exhausted their lines of credit; that they have verifiable expenses that they would lack funding to pay without the injunction; or that the injunction would inevitably force Plaintiffs into bankruptcy or out of business.

47. Rather, Plaintiffs describe the alleged irreparable harm they would suffer if the Cash Sweep occurs as follows:

> [The Cash Sweep Period would] deprive Plaintiffs of working capital required to continue to operate the shopping centers at-issue as a going concern. The liquidity changes that such a cash sweep would cause threaten irreparable harm because they put Plaintiffs at

> risk of default on the Loan and could potentially allow Defendants
> to take control of the shopping centers or some aspects of them [and]
> [s]uch a cash sweep would also affect the tenants of the shopping
> centers and, as a result would likely cause significant harm to
> Plaintiffs' business relationships with their tenants.

Mot. for Prelim. Inj., ECF No. 39, at ¶¶ 26–27.

48.     Plaintiffs further claim that the Excess Cash Flow allows the Plaintiffs to build up

"an internal reserve to address any shortfalls in debt service, escrow payments, operational

expenditures, or other items [and] [w]ithout access to any money beyond the budgeted operational

expenses, the Plaintiffs would not be able to maintain or build up cash reserves from which to draw

to make up any such shortfalls."  Reply Br. in Supp. of Mot. for Prelim. Inj., ECF No. 24, at 14.

However, the Excess Cash Flow is the money that remains in the Cash Management Account *after*

those expenses are paid;  therefore, Plaintiffs' claim that they will be without money to pay those

expenses during the Cash Sweep Period is inaccurate.  *See* Resp. in Opp. to Mot. for Prelim. Inj.,

ECF No. 15, at 2–3.

49.     Plaintiffs must submit a proposed annual budget of their operational expenses to

the Servicers for approval.  Loan Agree., Joint Ex. A, at §5.1.11(d).  The expenses accounted for

by the annual budget are not paid out of the Excess Cash Flow.  Plaintiffs are free to submit an

annual budget to the Servicers that includes additional funding in the event of the contingencies

they fear may need to be paid to prevent the purported irreparable harm they face without an

injunction from this Court.  The fact that they have not done so does not warrant the extraordinary

remedy of injunctive relief.

### III.    Conclusions of Law

#### A.  Standard of Review

50.     This case is a diversity action and although New York state substantive law applies, federal law governs the standard for a preliminary injunction.  *See Erie R.R. v. Tompkins*, 304 U.S. 64, 58 (1938);  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989); *Hadeed v. Advanced Vascular Res. of Johnstown, LLC*, Civil Action No. 3:15-cv-00002, 2016 U.S. Dist. LEXIS 169709, at *6–7 (W.D. Pa. Dec. 8, 2016).  Therefore, federal law determines the preliminary injunction standard and New York law determines whether Defendants have satisfied the standard.  *Hadeed*, 2016 U.S. Dist. LEXIS 169709 at *6–7.

51.     "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008);  *Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (courts should grant preliminary injunctions only in "limited circumstances");  *Instant Air Freight Co.*, 882 F.2d at 800.

52.     To obtain a preliminary injunction, the moving party must establish four factors:

> (1)  The likelihood that the plaintiff will prevail on the merits at final hearing;  (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of;  (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued;  and (4) [that] the public interest [weighs in favor of granting the injunction.]
>
> ***
>
> Generally, the moving party must establish the first two factors and only if these 'gateway factors' are established does the district court consider the remaining two factors. The court then determines 'in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.

*Greater Phila. Chamber of Commerce*, 949 F.3d at 133 (citations omitted));  *see also Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (citing *Del. River*

*Port Auth v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974));  *Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.,* 306 Fed.Appx 727, 732 (3d Cir. 2009);  13 Moore's Federal Practice – Civil § 65.22 (2020).

53.     To establish a likelihood of success on the merits, the movant must "demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)."  *Reilly*, 858 F.3d at 179;  *see also*, 42 Am. Jur. 2d Injunctions § 18 (2020) (explaining that to obtain a preliminary injunction, the movant must show that it is "reasonably likely" to succeed on the merits.).

54.     Even where a movant succeeds in showing a likelihood of success on the merits, if the other three factors are not satisfied, the court should exercise its discretion to deny the preliminary injunction.  *See Winter*, 555 U.S. at 32 ("An injunction is a matter of equitable discretion;  it does not follow from success on the merits as a matter of course.").

55.     "A failure to demonstrate irreparable injury must necessarily result in the denial of a preliminary injunction."  *Ace Am. Ins. Co.*, 306 Fed.Appx. at 732 (citations omitted).

56.     To establish irreparable harm, the movant must show "that it is more likely than not to suffer irreparable harm in the absence of preliminary relief."  *Reilly*, 858 F.3d at 179.   To do so, the movant "must demonstrate a potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *Instant Air*, 882 F.2d at 801.

57.     "In the absence of exceptional circumstances, economic loss does not qualify as irreparable harm [and] '[a]n inability to precisely measure financial harm does not make that harm irreparable or immeasurable.'" *Hadeed*, 2016 U.S. Dist. LEXIS 169709 at *7–8 (quoting *Acierno v. New Castle County*, 40 F.3dd 645, 655 (3d Cir. 1994);  *see also*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief will be

available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

58.    The risk of irreparable harm cannot be speculative;  "mere risk" of irreparable harm is insufficient—the movant must make a "clear showing of immediate irreparable injury, or a presently existing actual threat;  [an injunction] may not be used simply to eliminate the possibility of a remote future injury, or a future invasion of rights[.]"  *Holiday Inns of Am. v. B & B Corp.*, 409 F.2d 614, 618 (3d Cir. 1969);  *Continental Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir. 1980);  *Hadeed*, 2016 U.S. Dist. LEXIS 169709, at *8.

59.    "If the harm alleged stems from a breach-of-contract claim, then irreparable harm may be found in two situations:

> (1) where the subject matter of the contract is of such a special nature of peculiar value that damages would be inadequate; or (2) where because of some special and practical features of the contract, it is impossible to ascertain the legal measure of loss so that money damages are impracticable.

*Hadeed*, 2016 U.S. Dist. LEXIS 169709, at *8 (quoting *ECRI v. MCGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)).

60.    Though courts have recognized that being forced out of business or into bankruptcy may constitute irreparable harms warranting injunctive relief, the movant is required to demonstrate that, absent injunctive relief, the risk of either harm is more than speculative.  *See e.g., Doran v. Salem Inn, Inc.*, 442 U.S. 922, 932 (1975) ("As required to support such relief, these respondents alleged (and petitioner did not deny) that absent preliminary relief they would suffer a substantial loss of business and perhaps even bankruptcy.  Certainly the latter type of injury sufficiently meets the standard for granting interim relief, for otherwise a favorable final judgment might well be useless.");  *Minard Run Oil Co. v. United States Forest Serv.*, 670 F.3d 236, 255 (3d

Cir. 2011) ("As a general matter, a purely economic injury, compensable in money, cannot satisfy the irreparable injury requirement, but an exception exists where the potential economic loss is so great as to threaten the existence of the movant's business."  (internal citations and quotation omitted)); *Baker's Aid v. Hussmann Foodservice Co.,* 830 F.2d 13, 16 n.3 (2d Cir. 1987); *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1146 (3d Cir. 1982) (finding that injunctive relief was not warranted because the plaintiff did not establish that it would in fact be forced into bankruptcy without the injunction); *Instant Air Freight Co.* 882 F.2d at 802 (finding that injunctive relief was not warranted because the plaintiff did not proffer evidence that the plaintiff would, in fact, go out of business without the injunction); *Newlife Homecare Inc v. Express Scripts, Inc*., Civil Action No. 3:07-cv-00761, 2007 U.S. Dist. LEXIS 33031, at *11–14 (M.D. Pa. May 4, 2007) ("[T]he law requires convincing proof that a business will in fact cease to exist or be forced into bankruptcy for such an eventuality to be considered irreparable harm."); *Hillard v. Guidant Corp*., 37 F.Supp.2d 379, 383 (M.D. Pa. 1999); *see also Benjamin Kurzban & Son, Inc. v. Bd. of Educ.*, 129 A.D.2d 756, 757 (N.Y. App. Div. 1987) (denying a preliminary injunction where the plaintiffs' attorney's repeated allegations that plaintiff would be forced to go out of business was not supported by financial statements or other evidence:  "These bare, conclusory allegations were insufficient to satisfy the plaintiff's burden of demonstrating irreparable injury."); *Metropolitan Package Store Ass'n v. Koch*, 80 A.D.2d 940 (N.Y. App. Div. 1981) (denying a preliminary injunction where the plaintiff proffered no evidence to support its conclusory allegation that without the injunction, its members will be forced out of business).

### B.  Application

#### 1)  Likelihood of Success on the Merits

61.     Plaintiffs' Complaint contains three counts:  Count I alleges that the Servicers violated their purported duty of good faith and fair dealing under the Loan Agreement.  Count II alleges that the Servicers intentionally interfered with Plaintiffs' business relations with the Shopping Centers' tenants and prospective tenants by threatening the Cash Sweep and causing other delays.  Count III seeks declaratory judgment and injunctive relief based on the allegations that form Counts I and II.  *See* Compl., ECF No. 38.

#### a)  Breach-of-Contract Claim

62.     To prevail on a claim for breach of contract, the plaintiff must prove that:  (1) there is a valid contract between the parties;  (2) the plaintiff performed under the contract;  (3) the defendant breached the contract;  and (4) the defendant's breach harmed the plaintiff.  *See e.g., Palmetto Partners, L.P. v. AJW Qualified Partners, LLC,* 83 A.D.3d 804, 807 (N.Y. App. Div. 2011);  *see also* 1-7 Murray on Contracts § 108 (2011).

63.     Plaintiffs allege that the Servicers violated the implied covenant of good faith and fair dealing as to the Loan Agreement by carrying out the Cash Sweep Period.  Compl., ECF No. 38, at Count I.

64.     Plaintiffs are unlikely to prevail as to their claim that the Servicers violated the Loan Agreement because the Servicers are not parties to the Loan Agreement;  rather, the Loan Agreement is between Plaintiffs and the Lenders.  *See* Loan Agree., Joint Ex. A, at v.

65.     The Servicers carry out the Loan Agreement as the Lenders' agents.  It is black letter law that, where the agency relationship is disclosed, an agent's act in the scope of its agency is an act of the principal.  *See Ads Plus Advert., Inc. v.* Ault, 928 F.Supp.2d 683 (W.D.N.Y. 2013);

17

*William Stevens, Inc. v. Kings Village Corp.*, 234 A.D.2d 287, 288 (N.Y. App. Div. 1996);  *Trenga Realty v. Tiseo*, 117 A.D. 2d 951, 951 (N.Y. App. Div. 1986) ("Where there is a principal-agent relationship and a contract relates to a matter within the agency relationship, the agent will not be personally bound unless there is clear and explicit evidence that the agent intended to substitute his personal liability for that of his principal or that fraud is involved.");  Restatement (Third) of Agency § 1.01 (referenced by the New York Court of Appeals in *People v. Wells Fargo Ins. Servs. Inc.*, 16 N.Y.3d 166, 171 (N.Y. 2011).

66.     Moreover, Plaintiffs have not proffered any evidence to support that the Servicers assumed any obligation under the Loan Agreement that is enforceable by the Plaintiffs.

67.     Even if the Servicers owed the Plaintiffs a duty of good faith in connection with the Loan Agreement, Plaintiffs are unlikely to prevail on their contention that enforcing the Cash Sweep Period violates the implied covenant of good faith and fair dealing.

68.     "Freedom of contract is a 'deeply rooted' public policy of [New York]."  *159 MP Corp. v. Redbridge Bedford, LLC*, 33 N.Y.3d 353, 359 (N.Y. 2019) (quoting *New England Mut. Life Ins. Co .v Caruso*, 73 NY2d 74, 81 (1989)).

69.     New York's courts "have long deemed enforcement of commercial contracts according to the terms adopted by the parties to be a pillar of the common law . . . [and] have cautioned that, when a court invalidates a contractual provision, one party is deprived of the benefit of the bargain.  By disfavoring judicial upending of the balance struck at the conclusion of the parties' negotiations, our public policy in favor of freedom of contract promotes certainty and predictability and respects the autonomy of commercial parties in ordering their own business arrangements."  *159 MP Corp.*, 33 N.Y.3d at 359–60.

70.   Here, a JC Penney Cash Sweep Event occurred on October 18, 2020 and triggered the Cash Sweep Period under the express terms of the Loan Agreement.  *See* Joint Stips., ECF No. 45, at ¶¶ 21–26.

71.   Carrying out the Cash Sweep Period, however, does not constitute bad faith on the part of the Services.  Rather, the Servicers' execution of the Cash Sweep, pursuant to the terms of the Loan Agreement, would give effect to the Plaintiffs' bargained-for exchange, in furtherance of New York's strong public policy favoring freedom of contract.

72.   Accordingly, Plaintiffs have not shown that they are reasonably likely to prevail on their breach of contract claim against the Servicers for a violation of the implied covenant of good faith and fair dealing relating to carrying out the Cash Sweep Period of the Loan Agreement.

### b)  Tortious Interference Claim

73.   To prevail on a claim for tortious interference with business relations—also known as tortious interference with prospective economic advantage, under New York law, a plaintiff must show that "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *16 Case Duse, LLC v. Merkin*, 791 F.3d 247, (2d Cir. 2015) (citing *Catskill Dev., LLC v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (3d Cir. 2008) (internal citation omitted)).

74.   The "wrongful means" element is a "high bar"—"[u]nlike a claim for tortious interference with contract, which requires a plaintiff to show no more than that the defendant intentionally and without justification procured a breach of a valid contract of which he was aware, a claim for tortious interference with business relations requires a plaintiff to show, 'as a general rule,'" that defendant's conduct was tortious, criminal, or for the sole purpose of inflicting

intentional harm on the plaintiff. *16 Case Duse*, 791 F.3d at 262 (quoting *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (N.Y. 2004) (internal citation omitted)); *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F.Supp.3d 869, 908 (S.D.N.Y. 2016). "Methods sufficiently wrongful to be deemed tortious under New York law include physical violence, fraud, misrepresentation, civil suits, criminal prosecutions and some degree of economic pressure." *Rockland Exposition, Inc. v. Alliance*, *of Auto. Serv. Providers,* 894 F.Supp.2d 288*,* 334 (S.D.N.Y. 2012) (quoting *Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214–15 (2d Cir. 2002)).

75.     Here, to the extent that the Servicers acted to enforce the Loan Agreement by informing the Plaintiffs that the Lenders would retain the Excess Cash Flow during the pendency of the Cash Sweep Period, the Servicers' conduct was not wrongful under the analytical framework for intentional interference with business relations—it was not independently tortious, criminal, or done for the sole purpose of inflicting intentional harm on the Plaintiffs.

76.     Rather, the Servicers informed the Plaintiffs that the Cash Sweep Period commenced when JC Penney vacated its location at the Northtowne Mall because it was the third Tenant Trigger Event and, therefore, could not be cured under the terms of the Loan Agreement, which Plaintiffs signed;  to that end, recognizing and/or enforcing the Cash Sweep Period is merely ensuring continued performance, not a breach, of the Loan Agreement.

77.     Plaintiffs argue that commencing the Cash Sweep is wrongful because it is an unenforceable liquidated damage penalty under New York Law.  Reply Br. in Supp. of Mot. for Prelim. Inj., ECF No. 24, at 8.

78.     Under New York law, "[l]iquidated damages constitute the compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract.  In effect, a liquidated damage provision is an estimate, made by the parties at

the time they entered into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *Truck Rent-A-Center, Inc. v. Puritan Farms 2nd, Inc.*, 361 N.E.2d 1015, 1017–18 (N.Y. 1977). "'A liquidated damages provision has its basis in the principle of just compensation for loss' in the event of breach." *Interface Grp.-Nevada v. TWA (In re TWA)*, 145 F.3d 124, 134 (3d Cir. 1998) (quoting *Rent-A-Center*, 361 N.E.2d at 1018).

79.     "It is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach -- i.e., where the transaction would have failed, and the damage would have been suffered, even if no breach occurred." *Pesa v. Yoma Dev. Grp., Inc.*, 18 N.Y.3d 527, 532 (N.Y. 2012).

80.     Here, the Excess Cash Flow retained by the Lender as additional security for the Loan Agreement during the Cash Sweep Period is not an unenforceable liquated damage, and indeed, it is not a damage at all;  that is, it is not caused by a breach of any contract, but by the occurrence of a Tenant Trigger Event under the terms of the Loan Agreement.[3]  Accordingly, the Excess Cash Flow would be due to the Lenders even without a breach of the Loan Agreement. *See Pesa*, 18 N.Y.3d 527.

81.     Second, unlike liquidated damages which are awarded to make a party whole for the breach of another, the Lenders do not permanently retain the Excess Cash Flow.  To the contrary, the Lenders must return the Excess Cash Flow when Plaintiffs repay the Loan in full.

82.     Plaintiffs also argue that the Cash Sweep Period is wrongful because violates the New York Uniform Commercial Code, NY UCC § 9-601, *Rights after Default; Judicial*

---

[3] Notably, the structure of the Loan Agreement itself evidences that Tenant Trigger Events such as the JC Penney Trigger Event are not a breach of the Loan Agreement.  The definition of Cash Sweep Event includes Tenant Trigger Events and Events of Default separately, evidencing the parties' intent that Tenant Trigger Events are distinct from Events of Default. *See* Loan Agree., Joint Ex. A, at 38.

*Enforcement; Consignor of Buyer of Accounts, Chattel Paper, Payment Intangibles, or Promissory Notes*.  Reply Br. in Supp. of Mot. for Prelim. Inj., ECF No. 24, at 11.

83.      As the title suggests, section 9-601 relates to enforcing secured rights after an event of default;  however, here, the Cash Sweep Period is not a method for the Lenders or Servicers to enforce the Lender's secured rights after the Plaintiffs' default of the Loan Agreement.  The Cash Sweep Period is the Lender's negotiated and considered contractual right to obtain additional security in the event of a future default of the Loan Agreement.  Accordingly, section 9-601 of the New York Uniform Commercial Code is inapplicable to the Cash Sweep Period and it does not render the Servicers' intent to acknowledge and/or carry out the Cash Sweep Period unlawful, criminal, or wrongful.

84.     For these reasons, Plaintiffs are unlikely to succeed on the merits of their substantive causes of action.[4]

### 2)  Risk of Irreparable Harm

85.     Even if Plaintiffs could establish a reasonable likelihood of success on the merits, a preliminary injunction is still inappropriate because the Plaintiffs have not demonstrated that they would, more likely than not, suffer irreparable harm without the injunction.

86.     Plaintiffs allege that the Cash Sweep Period puts them at risk for a series of vague and speculative harms (Mot. for Prelim. Inj., ECF No. 39, at ¶ 12 ("This cash sweep action would deprive Plaintiffs of funds necessary for the operation and continued vitality of the shopping centers.");  ¶ 26 ("The liquidity changes that such a cash sweep would cause threaten irreparable harm because they put Plaintiffs at *risk of default* on the Loan and *could potentially* allow

---

[4] Given that Count III of Plaintiffs' Complaint seeks declaratory and injunctive relief based on the allegations that comprise Count I (Breach of Contract) and Count II (Intentional Interference with Contractual Relations), and the Plaintiffs are unlikely to succeed on the merits of either, the Plaintiffs are unlikely to succeed in establishing their claims under Count III.

Defendants to take control of the shopping centers or some aspects of them."  (emphasis added));
however, "mere risk" is insufficient to warrant a preliminary injunction.  *Holiday Inns of Am. v. B
& B Corp*., 409 F.2d 614, 618 (3d Cir. 1969).

87.     Plaintiffs did not provide any evidence of non-speculative, immediate irreparable
harm that they will more likely than not suffer without the Excess Cash Flow, such as invoices that
they will be unable to pay, or account balances showing that they will be forced out of business or
into bankruptcy without the Excess Cash Flow.

88.     Furthermore, the Plaintiffs have not established that they could not pay those
hypothetical expenses with other assets or resources without an injunction; for instance, the
Plaintiffs have not shown that they have exhausted their lines of credit and cannot obtain
alternative sources of funding.  *See Instant Air Freight Co*.,882 F.2d at 801 ("The preliminary
injunction must be the only way of protecting the plaintiff from harm.").

89.     Accordingly, Plaintiffs have not met their burden to establish they are more likely
than not to be irreparably harmed without an injunction to stop the Cash Sweep Period.  *Compare
Newlife Homecare,* 2007 U.S. Dist. LEXIS 33031, at *11–14 (granting a preliminary injunction
where the movant supported its claims that it would be forced out of business without the
injunction by evidencing that it had a negative cash balance of almost a million dollars and
climbing, that it had exhausted its lines of credit, and that it was already behind on bills).

## IV.    Conclusion

For the foregoing reasons, Plaintiffs have not established either the likelihood of success
or irreparable harm prong of the preliminary injunction analysis.  Therefore,  IT IS HEREBY
ORDERED THAT Plaintiff's Motion for Preliminary Injunction is denied.

DATED this 30th day of November, 2020.

BY THE COURT:


/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc:  All counsel of record via ECF